**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert HUTCHINGS,**
**Defendant-Appellant.**

**No. 723, Docket 84–1331.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 30, 1985.

Decided Feb. 25, 1985.

Robert Gage, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., Benito Romano, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Phylis Skloot Bamberger, The Legal Aid Society, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for defendant-appellant.

Before LUMBARD, NEWMAN and KEARSE, Circuit Judges.

LUMBARD, Circuit Judge:

Robert Hutchings appeals from a judgment of conviction entered on September 19, 1984 in the Southern District, Robert L. Carter, Judge. After a four-day jury trial, Hutchings was found guilty of interstate wire fraud in violatior of 18 U.S.C. § 1343 (Counts One through Three) and making false statements in a loan application to a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, in violation of 18 U.S.C. § 1014 (Count Four). Judge Carter sentenced Hutchings to consecutive five-year terms of imprisonment on Counts One and Two, a five-year term of imprisonment on Count Three and a two-year term of imprisonment on Count Four. The sentences on Counts Three and Four were to run concurrently with the sentence on Count Two. Judge Carter also imposed fines of $1,000 on each of Counts One through Three and $5,000 on Count Four as well as the costs of prosecution.

Hutchings seeks reversal of his conviction on the ground that certain testimony by a government agent was improperly admitted into evidence. Hutchings also challenges the sentence he received. We affirm Hutchings' conviction but remand to Judge Carter for resentencing.

I.

The government's investigation into the activities of Robert Hutchings commenced when the F.B.I. received a complaint about an attempt by Hutchings to purchase La Jolla Oil and Mineral, an oil company located in Texas. FBI Agent Vincent Wincelowicz posed as a financial consultant from New York City who would assist Hutchings in obtaining the financing for the acquisition of companies through the "rental" of letters of credit and bank loans supported by fraudulent collateral.

In a telephone conversation on March 24, 1983, Hutchings asked Agent Wincelowicz to have created a fraudulent $800,000 standby letter of credit that was to be used to prevent the Clayton Metro Bank in St. Louis, Missouri, from foreclosing on his residence and a fast-food franchise in which he had invested. Hutchings again asked Wincelowicz, on April 12, 1983, to have a fraudulent letter of credit for between $4.5 to $4.6 million created to facilitate the purchase of several companies. Agent Wincelowicz did not produce either letter of credit.

As part of his continuing effort to obtain large sums of money through fraudulent means, Hutchings, with the assistance of

Agent Wincelowicz and a William Breen, who was assisting the FBI, participated in negotiations with cooperating employees of Chemical Bank for a $5 million loan. In connection with the loan application, Hutchings completed a "Statement of Financial Condition." He listed his occupation as President of Eagle Pacific Holding Company ("Eagle") and indicated that he owned 100,000 shares of Eagle Stock with a market value of $19,335,642. At trial, the Vice President of Eagle testified that in March of 1983, Eagle had a net worth of zero. Furthermore, Hutchings listed his total assets as $21,584,863 and his net worth as $17,454,863. The documentation submitted by Hutchings in support of his application purported to represent his ownership in various properties but were, in fact, worthless financial documents, geological surveys, stock certificates, leases, engineers' reports, etc., which had been collected by Hutchings during unsuccessful attempts to purchase such properties.[1]

Following the submission by Hutchings of the loan application and the financial statement on April 18, 1983, Chemical Bank approved the loan, and a demand note of $5 million was produced which Hutchings executed as guarantor. On the same day, Hutchings was arrested before he could negotiate the note.

The evidence presented at trial by the government included tape recordings of Hutchings' conversations, documentary evidence, and the testimony of the F.B.I. agents and eight businessmen whom Hutchings induced to surrender financial and business records.

Hutchings called no witnesses.[2]

Agent Wincelowicz, during his testimony, defined several terms peculiar to confidence schemes involving negotiable instruments which were used by Wincelowicz or Hutchings during recorded conversations. For example, Wincelowicz defined a "player" as a confidence man and "stand-up paper" as financial paper that looked as if it could be negotiated in a bank.

■ Judge Carter's admission of the testimony as to what the terms meant to Wincelowicz was a proper exercise of his discretion. *See United States v. Fayer,* 573 F.2d 741, 747 (2d Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). Hutchings and Wincelowicz were speaking of financial transactions in terms which might well not be understood by many members of the jury. There was good reason for the court to believe that an explanation of the terms used in the conversations would assist the jury in considering and assessing this evidence. *See United States v. Carson,* 702 F.2d 351, 369–70 (2d Cir.) (testimony of agents as to matters within their expertise held admissible when it assists the trier of fact to understand the evidence), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983).

## II.

Hutchings challenges his sentence on the ground that, in imposing sentence, Judge Carter impermissibly considered Hutchings' decision to stand trial rather than plead guilty. On July 26, 1984, immediately after the jury found Hutchings guilty, Judge Carter stated that the trial had been a "total waste of public funds and resources ... there was no defense in this case. This man was clearly and unquestionably guilty, and there should have been no trial." Counsel was then asked whether "in view of the fact that this was a needless expenditure of public funds, ... I can consider that in sentencing." Judge Carter also inquired whether Hutchings could be

---

1. In Count Four of the indictment (SS 83 Cr. 607), Hutchings was also charged with concealing the fact that, at the time of his loan application, he was a defendant in three criminal actions pending in St. Louis, Missouri.

2. During cross-examination of the government's witnesses, the defense introduced several documents to show that Hutchings did not know, at the time of his loan application, that two executory contracts to purchase certain properties had been repudiated and to establish that he had made bona fide attempts to procure surety bonds in connection with the purchase by Eagle of certain mineral properties.

"taxed for the expenses of this prosecution." Defense counsel immediately objected stating that "Mr. Hutchings has a constitutional right to have a trial in a criminal matter." Judge Carter acknowledged the objection but stated that he believed he could take the needless expenditure of funds into consideration. "If I cannot, if the indications are that I cannot, I will not. But I certainly will if I have the right to do so...."

By letter dated August 17, 1984, the government advised Judge Carter that costs could be imposed and "[a]lthough a defendant may not be penalized for going to trial, the Court may consider the nature of the evidence presented against Hutchings at trial." On August 28, defense counsel wrote Judge Carter that "it would be improper for the Court, in deciding upon an appropriate sentence, to consider the fact that Mr. Hutchings elected to exercise his Sixth Amendment right to a jury trial rather than plead guilty." Hutchings' attorney also stated that costs should be imposed only on non-indigent defendants and because, prior to trial, the Court determined Hutchings to be indigent and assigned him counsel, costs should not be imposed on Hutchings. In addition, on August 27, Hutchings filed a motion asking that Judge Carter recuse himself on the ground that his statements showed an animus to Hutchings for deciding to go to trial.

At the sentencing on September 10, 1984, Judge Carter denied the motion to recuse stating: "I don't have any particular personal bias against Mr. Hutchings and I am reasonably certain that I can be fair in the sentence, although that doesn't necessarily mean that I am required to be lenient." Hutchings was then sentenced to the maximum prison terms and fines on each of the four counts though the terms of imprisonment on Counts Three and Four are to be served concurrently with the term on Count Two which is to be served consecutively to the term on Count One.

 The "[a]ugmentation of sentence" based on a defendant's decision to "stand on [his] right to put the Government to its proof rather than plead guilty" is clearly improper. *United States v. Araujo,* 539 F.2d 287, 291–92 (2d Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976). After the jury returned its verdict, Judge Carter stated that if he could not consider Hutchings' decision to stand trial, he would not. Yet, the record contains no unequivocal statement by the judge as to whether Hutchings' decision to go to trial was or was not considered in imposing sentence. Accordingly, we remand to Judge Carter for resentencing so that the record can be clarified on this point.[3]

 Finally, we reject Hutchings' objection to being taxed the costs of prosecution. "Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." 28 U.S.C. § 1918. Citing *United States v. Gering,* 716 F.2d 615, 626 (9th Cir.1983), Hutchings argues that because he was found indigent and assigned counsel by the district court, the imposition of costs is improper. The rule in this circuit, however, is that "[f]inancial obligations may be imposed upon a defendant who is indigent at the time of sentencing but subsequently acquires the means to discharge his obligations." *United States v. Brown,* 744 F.2d 905, 911 (2d Cir.) (citing *Fuller v. Oregon,* 417 U.S. 40, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974)), *cert. denied,* —— U.S. ——, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). Hutchings may assert a constitutional objection on the ground of his indigency only if the government seeks to enforce the court's order for costs "at a time when the defend-

---

**3.** We have recently reemphasized that, although it is normally unnecessary for a judge to supply a statement of reasons underlying a sentence, to do so is a "salutary" practice. *See United States v. Golomb,* 754 F.2d 86, 90–91 (2d Cir.1985). As we noted in *Golomb,* however, under the newly enacted Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1837, commencing in November of 1986, federal district judges will be required to state the reasons for every sentence imposed. *Id.* at 91.

ant [is] unable, through no fault of his own, to comply." *Id.* (citing *Bearden v. Georgia,* 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983)). The imposition of costs is therefore affirmed.[4]

The conviction is affirmed; the case is remanded to the district court for resentencing.

---

**4.** Hutchings' argument that the order imposing costs is invalid because it is vague and permits a non-judicial officer to determine the amount of costs is patently frivolous. The items included as "costs" are set forth in 28 U.S.C. § 1920 and Rule 11 of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. Rule 11 also provides the procedural framework for taxing costs. The taxing of costs by the clerk of the court is subject to modification by the district court. *See* Fed.R.Civ.P. 54(d).